I'd like to say one thing first, please. I understand there was a request from the counsel for the appellees to come up together and answer questions. That's not going to work. We are happy to have you stand up and say, I just want to answer questions, but I don't think that's going to work. It has to be one at a time. Thank you. Why does that make any difference at all? It goes to the application of Motley. Isn't the real question here whether or not there was either a reasonable basis or probable cause to believe that Mr. Whitmore lived there when, in fact, the forms that he filled out in the last five years gave it as an emergency contact, but not as someplace he lived, and he wrote down other places that he lived? He said he was homeless and he said he was living in this boarding house. I mean, that seems to me to be the question here, and not anything about whether this person is an absconded parolee or a non-absconded parolee. He was a parolee, and they had a right, if he were living there, to come in and deal with him. Your Honor, I would agree with that, and I would suppose that the most important part would be whether or not law enforcement at that time and place had a reasonable cause to believe that the resident was there. Well, first of all, what is the standard? Is it a reasonable cause or probable cause? I'm sorry, Your Honor, probable cause. Is it probable cause? Because Motley was after the fact, and in terms of the qualified immunity issue here, what is the standard? Well, the standard is probable cause. It's whether or not... Know that now, but what did the police have reasonable know at that time? Oh, I understand your question. I believe that at that time it was probably well established law and practice in the Department of Corrections for law enforcement to have some reasonable evidence that shows that the parolee, that's the reason the importance about the parolee, that the parolee, in fact, was a resident at the place to be searched. What case controlled at the time of this incident? Sorry? What case controlled at the time of this incident regarding the standard that parole officers had to meet, reasonable cause, probable cause, reasonable suspicion? What case controlled that? Well, I believe, Your Honor, that in Saucer v. Katz that the court had established that, first of all, where facts allege that a constitutional – well, I'm sorry, that's not correct. Yeah, I'm just asking what case set forth the standard that a police officer – that a parole officer had to comply with in seeking a parolee? Is it reasonable cause, reasonable basis, probable cause, reasonable suspicion to believe that the parolee lived at the place? We're just trying to get a handle on what the – at the time of the incident, what was the standard. It doesn't matter, is the rest of the question. Well, I know what the court's after and for. I mean, I'm at a complete loss right now to – I'll just have to admit to that, to coming up with exactly what cases might apply. And I know that in most of what is in here, what is in our brief, is the review of whether or not the court reviewed this properly. Well, for example, in – no, that was earlier. I'm sorry. Let me go into a later point. Go ahead. In the Motley and Bank case, they review what the law had been and I think can be found within the confines of that opinion. Well, I believe so, Your Honor. I know that in Saucer v. Katz that this court had determined that a qualified immunity would only apply where there was a determination that law enforcement officials were entitled to qualified immunity with a two-step analysis. And consideration of whether the facts alleged show the officer's conduct violated a constitutional right. That was the basic standard. Was a constitutional right established? Well, in 1979, in the Valley case, we said the parole officer needed a reasonable belief. And in 1997, in Conway, we said that we were – that the case law was all confused on the issue and as to whether it was reasonable belief or probable cause. So the question right now is, does it matter? In terms of the record, it seems that we're somewhat asking you questions that we're not prepared to answer. So maybe you ought to go on with your argument. But I think we all think that this is really the core of the case. Well, I believe that it is, Your Honor. But the court – I guess my point was, is that the court in making its decision relied on Motley. And therefore, in saying that the court misapplied Motley is the reason that we talked about the parolee status. But notwithstanding that, whether or not there was just standard probable cause for law enforcement officers to make an arrest. And in fact, in – The question isn't making an arrest. The question is whether there was probable cause or reasonable cause to think that Mr. Whitmore lived there. That being the case, there is nothing on the record that – that the defendants have supplied to the court to suggest that Mr. Whitmore resided there. Okay. Let's assume for a moment that there is – that whether it's reasonable cause or probable cause, because he had – all he said was this was an emergency contact and hadn't said he lived there since 1999 and, in fact, said he lived other places or said he was homeless and then said he lived in some boarding house. Then they get to the door. And they say to him – a person answers the door whom in some general way looks like him, like Whitmore. I mean, whether it looks enough like him may be a factual dispute which would have to be decided at trial. But in some general way, he looks like him. And they say, Randy, and he doesn't answer it. So what's the law at that point? Let's suppose – let's assume for now, and I would think this was a factual dispute, assuming that they had reason to think it was, in fact, Randy, whether or not Randy lived there. Okay. Then what? Could they have done what they did? I believe the law is they could not, Your Honor. They had – that would have been, since they didn't believe it was Whitmore's residence, it would have been a third party's residence. And law enforcement at that juncture has no authority, absent some exigent circumstances, to enter that residence, the residence of a third party. And once they put the foot in the door, they weren't entitled to do that, even if it was Randy. I believe that's correct, Your Honor. That was the – they had no reason to believe it was a residence. And it's clear that it needed to be the parolee's. They had to have some belief that it was the parolee's residence. Their argument is that at that point, there was no way the situation could be rectified to allow the officers to go any further. That's correct, Your Honor. The one thing they could have done is backed out of the residence. They could have, if they believed that was his residence, they could have taken – done their due diligence to discover whether it was or not, which they did not do, or they could have sought a warrant, which they did not do. Presumably, they could have stood outside in the meanwhile to see whether this person they thought was Randy who came out, because once he came out, they could have presumably detained him. There's many things they could have done that would not have violated Mr. Cuevas's, Ms. Burlett's Fourth Amendment rights. They did none of those. Did they think that it was Whitmore when they saw Cuevas who looked similar to him? And if they did think it was Whitmore, that they looked enough alike, would that rectify the situation? Your Honor, I believe that it would not. Even if they thought that Whitmore was in the house and they thought that was the case when they saw him, what would be their legal reason for making a forced entry into that house? It would require a warrant. They didn't seek a warrant. They had no reason to believe it was his residence. Okay. If you want to reserve your time. Thank you. I'll reserve what's left. Thank you, Your Honor. Good morning, Your Honor. Deputy Attorney General James Flynn for Parole Agent Iroko. The facts are that Parole Agent Iroko was seeking information on the whereabouts of a parolee named Randy Whitmore who had been released from prison in January of 2004 but had not reported to his parole agent for over a month and had provided no information on his current whereabouts. When he had gone back to prison previously in July, he had told parole officials that he didn't have a driver's license, didn't have a car, was homeless and was trying to get into a halfway house, which he apparently subsequently did for two days before going back into prison for a parole violation for an assault with great bodily injury. All right. So what is the reasonable belief or probable cause to believe he lived there at that house? Your Honor, I don't think that is critical to this case. Why not? Because I think police officials and parole agents can go to a door where they believe because this is an address that the parolee had given as a contact. And if you look at the record, there were numerous contacts in there. It was an emergency contact. Yes. It doesn't mean he was there. It means that somebody who was affiliated with it. I mean, I give my sister-in-law's house as an emergency contact. I don't live there. That's true. Counsel, if we were to agree that they could go and knock on the door and inquire, do you know anything about Whitmore? Exactly, Your Honor. But does that give them the right, then, to put their foot in the door? No. Then we have to go to the next step. They have a right to go ask and knock on the door, which they did. Then the next question is the person who answers the door, as the record indicates, bears a resemblance to Mr. Whitmore, the person they're seeking. They both have a mustache that goes to either their feet or something. Well, first of all, that would probably be a fact issue that would have to go to trial, it seems to me. But this is not the basis that the district court went off on. The district court viewed the summary judgment record incorrectly, quite possibly, as showing that he had given that as his address, which he did not do. And I agree with you, Your Honor. Okay. I agree with you, Your Honor. I think they did view it incorrectly. All right. It was an emergency contact point, but I think it still allowed them to go to that door. No. Sure. I can go to anybody's door. I can come to my door and knock and say and ask about where's Whitmore. But then we get the second fact. Unfortunately, Mr. Cuevas arguably resembled the parolee. And then when asked, are you the parolee, instead of saying no, and in fact Mr. Cuevas testified that his first reaction was they've got the wrong man. He didn't say you've got the wrong man. He didn't say I'm not Randy. Instead, he tried to shut the door immediately, which caused the parole agent and the officer to believe, he further believed, he is the man and he is now a felon who is attempting to flee. And to answer your question about why didn't they stand here and just let him close the door, then you've moved in. One, the officers are allowed to go in at that point, because a parolee, as this Court recently in Sherman and the Supreme Court in Sampson says, a parolee who is in that point. They are free to go in and get him. Counsel, there are a lot of unanswered questions about whether they could possibly have thought it was Cuevas, particularly the light. It was about dark. And the light, if anything, was behind so they wouldn't see the face. So the question that Judge Berzon asked, why isn't this a factual question that has to go to trial? It seems to me that's critical. Well, Your Honor, the light wouldn't have been behind, because Mr. Cuevas said the light on his porch, which was behind the officers, was burned out. Actually, the light was on Mr. Cuevas' face. The people he said he couldn't see the office, he couldn't see Officer Starr, who was behind Parole Agent DeRocco. So that's not exactly accurate. Counsel, don't we have to. And Mr. Cuevas said they looked in each other's eyes. But, Counsel, don't we have to. When we're looking at qualified immunity, is this qualified immunity? Yes, Your Honor, it is. Don't we have to look at the facts as if they are the way the plaintiff says they are? So we can't look at it in a light that's most favorable to the officers. That's correct. And what Mr. Cuevas says is he opened the door, he looked at Parole Agent DeRocco only from here up, so he did not see the badge below. Did he say he resembled the parolee? Did he make any statement regarding whether he resembled the parolee? He didn't say anything. He did not respond to the officer's question, Randy. No, but I mean in the context of the summary judgment. I don't understand. In the context of the summary judgment, did he dispute whether he looked like the parolee? No, not to my knowledge, Your Honor. He did not. And there are pictures, so. So at that point, the officers are entitled to go in until they get evidence to the contrary, that he is not the parolee. If they let that door close, then we're in a more difficult, we're in a barricade situation. They had already seen a hammer through a window. They had known someone else was in the house, so you could get into a possible house. People are allowed to have hammers in their house. That's certainly not a crime. It can be used as a weapon, obviously. And Mr. Whitmore had been arrested for, gone back in for assault with great bodily injury. I'm not talking about. Didn't the evidence show that Mr. Cuevas thought that this was probably a, that it was somebody had broken into their house. He didn't realize it was police officers. The testimony in the deposition at first was he thought it was the wrong man. They were looking for the wrong man. Yes, they were, but that doesn't mean they thought it was the police who were looking for the wrong man. It was somebody who was a assaulter who was looking. He sent his wife to call 911. He obviously, there was some credibility in that statement. I agree, Your Honor. This is a case where both people, both Agent DeRocco and Mr. Cuevas could have been entirely reasonable in their own perceptions from their own point of view. We're to look at it in the light most favorable to Mr. Cuevas. I agree, but that is not. We can't weigh the credibility. Let me ask you this. In defendant's response to plaintiff's response to separate statement of issues, undisputed facts and evidence, the statement is made that plaintiffs dispute the fact that DeRocco could see enough of Cuevas to determine whether or not Cuevas' appearance generally resembled Whitmore's description. Starr's testimony differs from DeRocco's. And so why wouldn't that be a question of fact that would preclude summary judgment on the issue of whether or not there was sufficient ability to observe Mr. Cuevas' appearance? I think that's a conclusory statement, number one, as to what they think. It's that plaintiffs dispute that. So if there's a dispute they have to have a factual basis for that. Well, they gave a factual basis. They said that the two officers said contrasting things. That's what they claim. I'm sorry, Your Honor. I don't recall that they did say contrasting things. Well, that's what Judge Rawlinson just read, that there was a difference between the officers as to what could be seen. I don't recall that. I'd have to go back and look at the record. But if that's part of the record, then that would be a question of fact that would preclude the entry of summary judgment on qualified immunity. I think you have a lawyer who wants to stand up. So thank you very much. Before you get going, I'd like to ask a question. I think there's no doubt that the Cuevas' have been injured, at least the evidence seems to appear to show that. And it also seems that there was a regrettable mistake here and that there's a good case that it was the officer's fault. Why isn't this a case for mediation? It seems to me there's a situation where the State of California, in its wisdom, would wish to compensate its citizens appropriately. Should we refer this to mediation? Well, from my perspective, I can tell you two things. I represent the county of El Dorado, not the state, not the parole officer, but the county and its officers. And we bent over backwards with Mr. Cuevas and Ms. Burlett afterwards. It's basically unprecedented. Realizing what had happened, even though a parole officer was struck in the face after this mistake, because of the arrest, sheriff, the elected sheriff, not some subordinate, the elected sheriff, Jeff Neves, the elected district attorney at the time, Gary Lacy, sat down with the family, with the baby, brought them a gift, apologized, made sure that his record of arrest would be sealed, did absolutely everything to deal with this. And then, of course, in the process of litigation, made some pretrial settlement proposals, which I know are not admissible in evidence. But there was an effort to resolve this, at least from my client's perspective. And we didn't do so immediately. And we weren't the ones who stuck the foot in the door either. Well, what we're asking, I am asking now, is whether there is an opportunity to go to mediation that might be fruitful. Perhaps the lawyer for the State would like to comment on that briefly. Your Honor, I recently had a case in effect. I raised that question during an argument in my office. I agreed to go to mediation in an attempt to make sure we weren't successful in that case. We, we, we, we, did they? And it was still helpful. Thank you. If it pleases the Court, I represent, my name is Franklin Gumpert, and I represent the County of El Dorado Sheriff Jeff Neves and three other officers who were present, plus the Sergeant Golmetz. I think it's very, very important. I understand where the Court is concerned with regard to what the parole officer may have done in sticking his foot in the door. I believe that the standard as of about the time of this incident in early 2004, which is before the Motley decision, was probably U.S. v. Harper, where there's, is there probable cause to believe, or maybe U.S. v. Gorman, which is, is there reason to believe that the person lived at that residence. But my clients didn't put their foot in the door. And I think that it has to be very clear. I've heard constantly both from the appellants and actually from the Court and from appellee's counsel, co-counsel, they, when they did this, my clients were outside until Officer DeRocco, a state parole officer, was hit. And I think that the distance between that hit and Starr's ability to walk into the residence constitutionally is about a millimeter. Once an officer is hit in the face by anybody, there's a battery, I think he has a right to go in and seize the person who hit him. And why is that? Why is that true? Because they're not going into the house. Certainly outside for sure, but what about in the house? Well, the officer at that point is watching a parole officer be hit in the face. There's a battery that's been committed in the presence of Officer Starr. Okay. But you're still crossing a threshold into a house. It would have to be an exigency theory of some kind, right? Well, to seize the person who had just struck the parole officer. I mean, he's watching a crime being committed in his presence. I think there's a right to grab him. I mean, literally the fist is outside. The door is open. The door is open. The door is open. The officer is hit through the opening of the door. The officer sees that. And what do the officers do after that? And at that point they actually, Starr, as an individual, went into the house, put the handcuffs on Mr. Cuevas, and the other officers came in, one did a one-minute, undisputed one-minute protective search, a sweep of the house, which is protected by the Maryland v. Bowie case. The other officers, one went into the house, talked to the wife to just explain what was going on, let her make phone calls, let her explain. But what was the reason for doing that? To go in and explain to her what was going on. But for going in the house at all? That was an officer who was there, yes. I understand that the guy was hit. But it still has to be some sort of an exigency reason to go into a house to arrest somebody. Generally you can't go into a house to arrest somebody without a warrant. So it had to be that they thought he was going to escape or they thought he was going to hurt somebody else or something. What's the exigency? Obviously, again, you've heard that there was a hammer that was visible. They didn't know who else was in the house. And they believed at that time that it was, they had reason to believe that it was the house of the felon. No, but that's, our premise here is that it was, there isn't reason to believe that. But, again, you're talking now the heightened ability to understand was there probable cause to believe that this was the person after he hit the parole officer who identified himself as a parole officer? That's the difference. It wasn't originally maybe that way. Maybe, oh, I didn't know that this is Mr. Cuevas or is it Mr. Whitmore or is it just some Joe citizen? What we do know is after the parole officer says I'm a parole officer and everyone hears it outside, all the officers, my clients, that the parole officer is struck in the face. I think that that would now sort of tip the scale to believe, yes, this was in fact Mr. Whitmore at that point. Did Mr. Cuevas say he did not hear anyone identify himself as a parole officer? He did say that when he was in the house there was some music in the house and he and his girlfriend were in the back of the house and they heard the door, but he didn't hear the words parole officer. But we're testing under the Constitution, the Fourth Amendment, the question is the reasonable belief of an objectively qualified officer. We're on qualified immunity. So in qualified immunity, the facts are looked at in the light most favorable to the person who's complaining, right? Of course, I think you only get there if you found that there was a violation of the Fourth Amendment first, and then whether the officer has acted with objective reasonableness. And I have trouble understanding the constitutional harm. I guess one of the things you're saying is that even if Cuevas didn't hear that he said parole officer, your clients did and they, therefore, may have drawn different, may have been able to believe that he heard that and, therefore, he was battering a police officer even if, in fact, he didn't hear it. Correct. Anyway, your time is up, so thank you very much. I want to just make one comment. And it seems to me that part of the problem in this case is that the parole officer was not properly attired. It would seem to me that you ought to be in uniform instead of in a sloppy Hawaii shirt. That's directed to the state. Thank you. We will give you a few extra minutes to make up for the time. Thank you, Your Honor. I think this might be a good time for me just to sit down, but... Well, what about the mediation question? Do you think it's a good idea? I believe the mediation is a good idea. In fact, when we first filed this appeal, we spoke with the mediator of this court and allowed how we were prepared to do that. It just didn't happen. Counsel, would you address the county defendants who are in a little different posture than the state defendants? Your Honor, I would agree that they are in a little bit of difference, but the problem here is that they created the very circumstance that they then relied on for probable cause to enter the house. The county created that circumstance? A group of law enforcement officers there. The county didn't act unilaterally, and I don't believe that the state acted unilaterally. They acted as a team. What was the role of the county officers, to your knowledge? Generally speaking, their role was to act as a backup and security for the knock and talk. So you think that any actions that were taken by the state parole officers are directly attributable to the county? I don't believe that any and all of them are. I don't believe that the county necessarily had the responsibility for the same due diligence to assure that it was the residents that the state did. However, they had to have some belief that the state had met that responsibility prior to a forced entry into the house. What about the suggestion that was just made, that let's assume that whether or not Quavers heard state parole officer or state parole, the other officers heard it? And so they believed that that Quavers heard it, even if he didn't hear it. And then the next thing they know is that whoever went through the door punches the parole officer. At that point, can they go in? You know, Your Honor, I believe that they cannot, because still there's no exigent circumstance. There's no ‑‑ I mean, they could imagine almost anything, but they have no evidence that whoever is in that house is ready to commit another crime or is about to escape it. Well, could they believe that now they have reason to think that's actually Whitmore and Whitmore's house because of the way the person who answered the door behaved? You know, I suppose there's some metaphysical opportunity for all that to run through their head and for them to decide, well, I didn't think it was his residence, but now because of this event, it could be. Well, they could say we thought it was his residence before, and now we're sure it's his residence because he came through the door and didn't respond in person. Yeah, if they had been to that residence before, but there's no evidence that they had been to the residence. Oh, no, no, no. What unfolded, probable cause can develop as events unfold. And in this case, if they thought it was his house and then they announced themselves or the parole officer announced himself, the person came to the door and reacted by punching the officer, that could reinforce their reasonable belief or their probable cause. You know, I would agree if that were the circumstance. That was not the circumstance. There was a knock on the door, the door was answered, so obviously Mr. Cuevas was willing to answer the door. This person is behaving kind of strangely. He's standing in a way that looks hostile. When Mr. Cuevas attempts to close the door, consensual, he doesn't have to talk to this person. He doesn't recognize him. He doesn't hit him first. He attempts to close the door. The officer, Mr. Starr, is standing right behind Agent DeRocco, and he sees this happening. And then he sees DeRocco begin to force entry. He's a law enforcement officer. He should know at that time he ought to be protecting that citizen. But, in fact, what happens is, and it happens in a matter of seconds, DeRocco is attempting forced entry, and Starr is assisting him. That's when Agent DeRocco gets hit. So the circumstance is slightly different than was offered. Or it could be self-found, and that's why perhaps we need a trial. So thank you very much for your argument. Thank you. It's an interesting case. Yes. And if the Court intends to defer this mediation and issue an order that happened on the other day, it's not permitted, but we're giving a certain amount of time. Yeah, that's what we do. We would issue an order and give you a certain amount of time to decide essentially whether you want to go to mediation after talking to our mediators. And then that case would be submitted. Right. We would defer submission is what we would do. Thank you very much. The case of Cuevas v. California is submitted for now. And we go to McCullough v. Cain.
judges: Fletcher, Berzon, Rawlinson